# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2230

_____

Thomas Eisenrich,                                  *
                                                   *
            Appellee,                              *
                                                   *    Appeal from the United States
      v.                                           *    District Court for the
                                                   *    District of Minnesota.
Minneapolis Retail Meat Cutters and                *
Food Handlers Pension Plan,                        *
                                                   *
            Appellant.                             *

_____

Submitted:  December 12, 2008
    Filed:  July 31, 2009

_____

Before COLLOTON and SHEPHERD, Circuit Judges, and GOLDBERG,[*] Judge.

_____

COLLOTON, Circuit Judge.

After retiring from his job as a meat cutter, Thomas Eisenrich began receiving
monthly benefits from the Minneapolis Retail Meat Cutters and Food Handlers
Pension Plan ("Plan").  When Eisenrich later began to work as an independent
distributor for a baked goods company, however, the Plan stopped paying his monthly
benefits, asserting that his new employment made him ineligible.  Eisenrich brought
suit against the Plan under the Employee Retirement Income Security Act of 1974

_____

[*]The Honorable Richard W. Goldberg, Judge of the United States Court of
International Trade, sitting by designation.

("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that his benefits were wrongfully suspended. The district court granted summary judgment for Eisenrich and awarded him attorneys' fees. The Plan appeals. We affirm the grant of summary judgment but reverse the award of attorneys' fees.

I.

The Minneapolis Retail Meat Cutters and Food Handlers Pension Plan is a pension fund created by agreement between Minneapolis-area employers in the retail food and meat industry and the Amalgamated Meat Cutters and Butcher Workmen of North America, District Local 653. As part of the agreement, the employers are required to contribute to the pension fund on behalf of their employees represented by the union. When these employees retire, they become eligible to receive from the fund a monthly pension benefit.

Like most employee pension funds, the Plan is subject to the requirements of ERISA. Under ERISA, pension plans must provide that "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Consistent with this requirement, however, multiemployer plans may condition benefits on an employee's promise not to engage in certain kinds of employment after retirement. If a retiree returns to work "in the same industry, in the same trade or craft, and the same geographic area covered by the plan," ERISA allows the retiree's benefits to be suspended for as long as he remains in that employment. *Id.* § 1053(a)(3)(B)(ii). Incorporating these terms, the Plan provides that a retiree's "monthly benefit will be suspended for any month for which he was paid for at least 64 hours in Disqualifying Employment" – namely, employment in "an industry . . . covered by the Plan," in "the geographic area covered by the Plan," and in "a trade or craft in which [he] worked under the Plan at any time."

As a meat cutter for thirty years, Eisenrich was a member of the union and a participant in the Plan. After he retired in 2001, Eisenrich began receiving pension benefits of approximately $1600 per month. The Plan suspended his monthly benefits in March 2002, after he accepted a position supervising the meat department at a Target store. According to the Plan, Eisenrich's job in the meat department was disqualifying, because it was in the same industry, in the same trade or craft, and in the same geographic area as his previous job as a meat cutter. In May 2004, Eisenrich informed the Plan that he had left his position at Target and that he intended to begin work as an independent distributor, or "sales development associate," for Pepperidge Farm, a baked goods company. The Plan resumed monthly benefit payments the next month.

In 2005, the Plan asked all retirees who were receiving monthly benefits to complete a form describing any employment in which they were then engaged. Eisenrich submitted an affidavit confirming that he was working an average of 160 hours per month as a distributor for Pepperidge Farm, delivering and merchandising the company's products. Concerned that Eisenrich was engaged in disqualifying employment, the Plan researched Eisenrich's position on Pepperidge Farm's website, where it verified that "sales development associates" were involved in merchandising the company's products. The Plan also hired a private investigator to document Eisenrich's work activities. After conducting over eighty-three hours of surveillance, the investigator reported observing Eisenrich deliver boxes of Pepperidge Farm baked goods to retail stores in the geographic area covered by the Plan.

Based on Eisenrich's affidavit, Pepperidge Farm's website, and the private investigator's report, the Plan concluded that Eisenrich was working in the same industry, in the same trade or craft, and in the same geographic area as when he was a meat cutter. In January 2006, the Plan informed Eisenrich that it was suspending his benefits, retroactive to July 1, 2005, the date he submitted his affidavit. Eisenrich appealed to the Plan's Board of Trustees, which upheld the decision to suspend his

benefits. When Eisenrich requested arbitration, the Board concluded that he had no right to arbitration under the terms of the Plan.

Eisenrich brought suit against the Plan under section 502(a)(1)(B) of ERISA, which allows actions by a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Eisenrich sought an order compelling arbitration, claiming that the Plan wrongfully denied his right to appeal the Board's decision to an arbitrator. In the alternative, Eisenrich sought reinstatement of his monthly benefits and recovery of benefits wrongfully suspended. He alleged that he was not engaged in disqualifying employment, and that even if he was, the Plan was equitably estopped from suspending his benefits because it resumed payments after learning of his Pepperidge Farm distributorship in May 2004.

The district court dismissed Eisenrich's arbitration claim, concluding that the terms of the Plan afforded him no right to arbitration. Proceeding to the merits of the Plan's decision to suspend Eisenrich's benefits, the district court determined that Eisenrich's job as an independent distributor for Pepperidge Farm was not in the same "trade or craft" as his previous job as a meat cutter. *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 544 F. Supp. 2d 848, 858 (D. Minn. 2008). The court *sua sponte* granted summary judgment for Eisenrich on the ground that he was not engaged in disqualifying employment, and dismissed his equitable estoppel claim as moot. *Id*. Finding, among other things, that the Plan's decision to suspend Eisenrich's benefits "patently lacked merit," the court exercised its discretion under ERISA to award Eisenrich $25,800 in attorneys' fees.

-4-

II.

The Plan argues that the district court erred in granting summary judgment for Eisenrich. We review the district court's decision *de novo*, and we will affirm the grant of summary judgment if, viewing the evidence in the light most favorable to the Plan, there is no genuine issue of material fact and Eisenrich is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *West v. Local 710, Int'l Bhd. of Teamsters Pension Plan*, 528 F.3d 1082, 1085 (8th Cir. 2008).

The question before us is whether the Plan wrongfully suspended Eisenrich's monthly pension benefits. The Plan's trust agreement gives the Plan's trustees "full and exclusive authority to determine all questions of coverage and eligibility," as well as "full power to construe" the terms and provisions of the agreement and "the by-laws and regulations issued thereunder." Accordingly, we review the Plan's decision to suspend Eisenrich's benefits for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). We will not disturb the Plan's decision so long as it is based on a reasonable interpretation of the Plan's terms and is supported by substantial evidence in the record before the Plan's administrators. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc).

Under the Plan, a participant's benefits may be suspended in any month he works at least sixty-four hours in "an industry . . . covered by the Plan," in "the geographic area covered by the Plan," and in "a trade or craft in which the Participant worked under the Plan at any time." Eisenrich does not dispute that as an independent distributor for Pepperidge Farm, he works more than sixty-four hours per month in "an industry . . . covered by the Plan" and in "the geographic area covered by the Plan." Nor does he dispute that he was previously employed under the Plan in the "trade or craft" of meat cutting. Whether the Plan abused its discretion in suspending Eisenrich's benefits thus turns on whether his current employment as an independent distributor is in the same "trade or craft" as his previous employment as a meat cutter.

-5-

The Plan maintains that its decision to suspend Eisenrich's benefits rests on a reasonable interpretation of the Plan's language. According to the Plan, a "trade or craft" refers to the skills typically performed by current employees within a certain occupation. On this view, the "trade or craft in which [Eisenrich] worked under the Plan" refers to the skills generally used by meat cutters today, not the skills actually used by Eisenrich himself. Based on the description of "meat cutter" in the union's collective bargaining agreement, the Plan contends that present-day meat cutters are involved in stocking shelves, rotating products in displays, and ordering new products – activities in which they use merchandising and other retail skills. The Plan asserts that independent distributors, like Eisenrich, use those same skills in filling purchase orders and arranging goods on shelves. Because the skills used by meat cutters and those used by independent distributors overlap, the Plan argues, Eisenrich is working in the same "trade or craft" as he was before.

Eisenrich contends that the Plan's interpretation of "trade or craft" is impermissible because it conflicts with the substantive requirements of ERISA. *See Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992). According to Eisenrich, ERISA defines a retiree's "trade or craft" in terms of the skills the retiree *actually* used while employed, and because the Plan adopted a contrary definition, his benefits were suspended in violation of ERISA's requirement that they not be forfeitable. If Eisenrich is correct, then the Plan necessarily abused its discretion. Because the Plan may not disregard federal law, any decision that is "erroneous as a matter of law" is an abuse of discretion and cannot stand. *Hill v. AT&T Corp.*, 125 F.3d 646, 650 (8th Cir. 1997).

Whether the Plan's decision is erroneous as a matter of law is a question we review *de novo*. *See Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307, 312 (8th Cir. 1979). Although we must defer to the Plan's reasonable interpretation of the Plan itself, we owe no deference to the Plan's interpretation of controlling law. *See Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir.

2006); *Penn v. Howe-Baker Eng'rs, Inc.*, 898 F.2d 1096, 1100 & n.3 (5th Cir. 1990); *Holt v. Winpisinger*, 811 F.2d 1532, 1535-36 (D.C. Cir. 1987). ERISA's definition of "trade or craft" is a matter of what Congress (or an agency exercising rulemaking authority delegated by Congress) meant, and "we must treat this as we would any other question of statutory construction." *Riley v. MEBA Pension Trust*, 570 F.2d 406, 410 (2d Cir. 1977).

Beginning with the plain language of the statute, we observe that section 203(a) of ERISA requires each pension plan to "provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Against the background of this general requirement, section 203(a)(3)(B) provides that in the case of a multiemployer plan:

> A right to an accrued benefit derived from employer contributions *shall not be treated as forfeitable* solely because the plan provides that the payment of benefits is suspended for such period as the employee is employed, subsequent to the commencement of payment of such benefits . . . , in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced.

*Id.* § 1053(a)(3)(B) (emphasis added). In short, consistent with ERISA's nonforfeitability requirement, multiemployer plans may suspend the benefits of retirees who return to work in the same industry, in the same trade or craft, and in the same geographic area in which they worked before they retired.

ERISA does not define "trade" or "craft," or elaborate on what it means for a job to be "in the same trade or craft" as another. Its language does not resolve whether an employee's "trade or craft" is defined by what the employee actually did in his former job, or what employees with the same job title typically do. Nor does the statute's history or purpose shed much light on the issue. In allowing plans to suspend the benefits of retirees who accept certain kinds of postretirement

employment, "Congress seems to have been motivated at least in part by a desire 'to protect participants against their pension plan being used, in effect, to subsidize low-wage employers who hire plan retirees to compete with, and undercut the wages and working conditions of employees covered by the plan.'" *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 742 n.1 (2004) (quoting 120 Cong. Rec. 29,930 (1974) (statement of Sen. Williams regarding section 203(a)(3)(B))). But assuming that Congress sought to prevent the "evil of 'doubledipping,' i.e., a pensioner's taking a job that would otherwise have been available to a member of the union who had not retired," *Riley*, 570 F.2d at 410, the statute does not speak to the precise question at issue. The meaning of "trade or craft" in ERISA is ambiguous.

Where Congress has delegated authority to an agency to implement an ambiguous statute, we are required to accept the agency's statutory interpretation, so long as it is reasonable. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Here, Congress has authorized the Department of Labor to "prescribe such regulations as may be necessary to carry out the purposes" of section 203(a)(3)(B). 29 U.S.C. § 1053(a)(3)(B). Pursuant to this authority, the Department issued a regulation defining "trade or craft" as:

> (A) a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry, (B) a skill or skills relating to selling, retailing, managerial, clerical or professional occupations, or (C) supervisory activities relating to a skill or skills described in (A) or (B).

29 C.F.R. § 2530.203-3(c)(2)(ii). This regulation further states that "the determination whether a particular job classification, job description or industrial occupation constitutes or is included in a trade or craft shall be based on the *facts and circumstances of each case*." *Id.* (emphasis added). We understand this language to prohibit a plan from deciding whether a retiree worked in a "trade or craft" based

solely on the retiree's "job classification, job description or industrial occupation." Because a plan must rely on the "facts and circumstances of each case," it must consider the "skill or skills" actually used by the retiree in his job.

This reading of the regulation accords with the Department's own understanding, which itself is entitled to substantial deference. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006); *Auer v. Robbins*, 519 U.S. 452, 461 (1997). In commentary published with the regulation at the time of its promulgation, the Department explained that "it is the use by the retiree of [particular] skills . . . , rather than performance of duties under any specified job description or classification, which is important for determining whether there is employment in the same trade or craft under section 203(a)(3)(B)." 46 Fed. Reg. 8894, 8900 (Jan. 27, 1981). According to the Department, the analysis should be "functional": "a retiree would be employed in the same trade or craft if post-retirement employment required the use of the same skills as preretirement employment, regardless of whether, for example, the preretirement employment was as a 'bricklayer' and the post-retirement employment was as a 'mason.'" *Id.* The Department's commentary confirms that examining the "facts and circumstances of each case" means looking beyond the skills typically associated with a particular job. Under the "functional" approach embraced by the regulation, a plan must look to the skills put to "use by the *retiree*," not by other employees in his occupation.

We conclude that the Department of Labor's regulation represents a reasonable interpretation of "trade or craft" and is entitled to deference under *Chevron*. Therefore, a retiree's "trade or craft" should be defined by the skills he actually used while employed. In this case, there is no disagreement on the skills Eisenrich actually used while employed as a meat cutter. Eisenrich represented to the Board that his meat-cutting position involved "cutting meat, grinding meat, wrapping meat, and making meat products," as well as "occasionally dealing with store customers." The Plan does not dispute that these were the skills actually used by Eisenrich as a meat

cutter. Nor does it dispute that none of these skills is currently used by Eisenrich as an independent distributor for Pepperidge Farm. Indeed, the record shows that Eisenrich's current position involves driving a truck, delivering goods, stocking shelves, and occasionally interacting with store employees. Eisenrich is not working in the "same trade or craft" as he was before, because he does not use any skills as an independent distributor that he used as a meat cutter.

The Plan reached a contrary conclusion, based on an interpretation of "trade of craft" that conflicts with the Department of Labor's authoritative construction of ERISA. Applying its interpretation, the Plan suspended Eisenrich's benefits, and impermissibly treated them as forfeitable under section 203(a), even though he is not employed "in the same trade or craft" within the meaning of section 203(a)(3)(B)(ii). Because the Plan's decision to suspend Eisenrich's benefits is erroneous as a matter of law, and thus an abuse of discretion, we affirm the district court's grant of summary judgment for Eisenrich.

## III.

The Plan also argues that the district court erred in awarding Eisenrich attorneys' fees. Section 502(g)(1) of ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In exercising that discretion, a court should consider a number of factors, including:

> (1) the degree of culpability or bad faith of the opposing party; (2) the
> ability of the opposing party to pay attorney fees; (3) whether an award
> of attorney fees against the opposing party might have a future deterrent
> effect under similar circumstances; (4) whether the parties requesting
> attorney fees sought to benefit all participants and beneficiaries of a plan
> or to resolve a significant legal question regarding ERISA itself; and (5)
> the relative merits of the parties' positions.

-10-

*Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 969 n.4 (8th Cir. 2002) (en banc). These factors, drawn from *Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984) (per curiam), serve as "general guidelines for determining when a fee is appropriate." *Martin*, 299 F.3d at 972.

In awarding Eisenrich attorneys' fees, the district court considered the factors set forth in *Westerhaus*. Its evaluation of those factors, however, turned largely on a single consideration: the district court's view that the Plan's decision to suspend Eisenrich's benefits could not be justified. Thus, the court began its discussion with the fifth factor, finding that the Plan's "position in this matter patently lacked merit." Discussing next the first factor, the court reasoned that the Plan's "insistence on its untenable (and ultimately unsuccessful) position smacks of bad faith." The court pointed as evidence to the fact that the Plan adopted "an indefensible reading of the Plan's terms," long after it first learned about Eisenrich's employment as an independent distributor, as well as the fact that Eisenrich had sued the Plan successfully in a previous dispute. After mentioning the second factor – and noting that the Plan provided "no evidence" that it was unable to pay a fee award – the court proceeded to the third, expressing its belief that an award would deter the Plan "from adopting such an overbroad and unwarranted reading of the Plan's terms in the future." The court concluded that taken together, the *Westerhaus* factors justified an award of attorneys' fees to Eisenrich.

We conclude that the district court abused its discretion in awarding Eisenrich attorneys' fees. In our view, the Plan's position is not as "untenable," "indefensible," "overbroad," or "unwarranted" as the district court thought. The relative merits of the parties' arguments are more evenly balanced than the court described. Although the Plan's position is mistaken, it is not egregiously so. ERISA itself is unclear about the meaning of "trade or craft," and there is little or no federal case law that explores the legal question raised in this dispute. We confront a question of first impression, with reasonable arguments on both sides, and it is only after a careful review of

-11-

administrative rulemaking and regulatory history that we reach a decision in favor of Eisenrich. Under these circumstances, we believe that the district court committed a clear error of judgment in viewing the Plan's position in such negative terms, and in relying so heavily on that view in weighing the relevant factors. *See Maune v. IBEW, Local No. 1, Health & Welfare Fund*, 83 F.3d 959, 964 (8th Cir. 1996). We therefore reverse the district court's award of attorneys' fees to Eisenrich.

*       *       *

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part.

_____