NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0104n.06

Case No. 21-2951

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| WILLIAM W. HELGEMO, | ) | **FILED**<br>Mar 07, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| OPERATING ENGINEERS LOCAL 324 | ) | DISTRICT OF MICHIGAN |
| PENSION FUND; OPERATING ENGINEERS | ) |  |
| LOCAL 324 RETIREE BENEFIT FUND, | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |
|  | ) |  |
|  | ) |  |

BEFORE: SUTTON, Chief Judge; GIBBONS and GRIFFIN, Circuit Judges.

SUTTON, Chief Judge. At retirement, William Helgemo began receiving monthly benefits from the Operating Engineers Local 324 Pension Fund. The Pension Fund eventually halted the payments when it learned that Helgemo was working for another company in a related field, an action that violated the terms of the pension agreement. Helgemo challenged that decision through this lawsuit. The district court upheld the Pension Fund's decision under arbitrary-and-capricious review. We affirm.

I.

The Operating Engineers Local 324 Pension Fund is a product of a collective bargaining agreement. The Pension Fund receives contributions from employers for their union-represented employees. When the employees retire, they qualify for a monthly pension benefit from the fund.

Like many pension funds, this one must comply with the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* Under ERISA, a pension fund may condition benefits on an employee's promise not to engage in certain types of postretirement employment. If a retiree returns to work "in the same industry, in the same trade or craft, and the same geographic area covered by the plan," ERISA permits the fund to suspend the retiree's benefits for as long as he remains in that employment. 29 U.S.C. § 1053(a)(3)(B)(ii); *see* 29 C.F.R. § 2530.203-3.

Consistent with this law, the Pension Fund sets forth "suspension of benefit" rules in its operating plan. Under § 3.6(a) of the plan, the Fund may suspend a participant's pension benefits if he works (1) 40 or more hours a month, (2) in Michigan, (3) in a job in the "same industry" as a fund-contributing employer, and (4) in the "same trade or craft" in which he was originally employed. R.13-15 at 21–23. Any retiree who intends to return to such work "must notify" the Pension Fund. *Id.* at 22. The plan gives trustees "sole[]" discretion to make benefits determinations. *Id.* at 51. The plan also permits the Pension Fund to waive the postretirement-work rule.

For more than 21 years, William Helgemo worked at Hardman Construction as a heavy equipment operator and superintendent. Hardman handles construction projects around the Great Lakes, often in marine-related construction jobs. Helgemo primarily operated cranes, piling equipment, backhoes, and other heavy machinery. Under the pension plan, Hardman contributed to the Pension Fund on Helgemo's behalf during his tenure.

In 2008, at age 55, Helgemo retired from Hardman. His retirement made him eligible for a pension of roughly $4,000 a month. Along with his pension approval came a bolded notice: "If you return to work as an operating engineer or in a related capacity within the State of Michigan,

you will be subject to the Plan's suspension of benefit rules. It is your responsibility to send written notification of your return to work at any job to the Fund office." R.13-3 at 12.

In 2013, Helgemo returned to work. He joined S.S. Badger Lake Michigan Carferry Service as a "laborer." R.13-4 at 2. The company transports passengers and goods between Michigan and Wisconsin across Lake Michigan and must use heavy equipment to move the goods. Helgemo later took a second job with a sister company, Pere Marquette Shipping Company, as a "handyman." R.13-3 at 46. Pere Marquette also transports goods throughout the Great Lakes. Helgemo worked at these companies for several years. He did not disclose this work to the Pension Fund or ask for a waiver from the Fund to take on these jobs.

In February 2018, a union member reported seeing Helgemo operating heavy machinery. An agent for the Pension Fund, Brandon Popps, investigated the situation, observing Helgemo running an excavator and a front-end loader. As proof, Popps took several photographs and gave them to the Pension Fund. Popps estimated that Helgemo operated machinery for several hours over the two days he watched him.

Based on this investigation, the Pension Fund told Helgemo that it would suspend his monthly pension benefits.

Helgemo appealed the Pension Fund's decision. He claimed that his new jobs differed from his work at Hardman and fell outside the scope of the suspension rule. In support, Helgemo submitted several forms that documented his postretirement work. The documents demonstrated that his new employment entailed diverse tasks that one might expect of a general laborer or handyman—roof repair, plumbing, and other odd jobs. But the documents also confirmed that Helgemo spent significant time operating heavy machinery. One coworker, Daniel Meeuweberg, noted that he "knew [Helgemo] was very capable to load the trucks because of his past work

3

experiences" and that he therefore sometimes had Helgemo use an excavator "to load the trucks that would come throughout the day." R.13-4 at 4. He added that "[e]ach truck would take 30 minutes to load and we would load 4 to 6 trucks a day." *Id.* Another coworker, Roger Beadle, said that Helgemo worked no more than "20 hours in a month in equipment." *Id.* at 9. Similarly, Pere Marquette's Chief Operating Officer, Chuck Leonard, said that Helgemo would "load old deck boards onto a truck" while doing "deck replacement," which he said "typically" took "three to five hours a week for two to three weeks annually." *Id.* at 6–7. Leonard offered Helgemo a formal position as an "operator," which Helgemo purportedly rejected due to the pension plan's restrictions. *Id.*

During the appeal, the Pension Fund reinstated Helgemo's benefits going forward so long as he verified that he was no longer working. At the same time, it asked Helgemo for more information about his past work, including payroll information and "a breakdown of the hours worked by each of the detailed job descriptions including your operation of heavy equipment." R.13-10 at 1. Helgemo gave them the payroll information but did not provide any documents that broke down the number of hours he spent on each task.

The Pension Fund denied Helgemo's appeal in the end. It concluded that his new employment satisfied the conditions for suspension of benefits and that he never requested a waiver from this prohibition. The Pension Fund determined that Helgemo owed it $141,796.52. To obtain the reimbursement, the Pension Fund deducted set amounts monthly from his reinstated pension benefits.

Helgemo sued the Pension Fund. As the litigation proceeded, Hardman rehired Helgemo, who apparently continues to work at his old company as of the time of this decision. Finding no error under arbitrary-and-capricious review, the district court upheld the Pension Fund's decision.

4

II.

*Standard of review.* We review the district court's legal determinations with fresh eyes. *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 547 (6th Cir. 2020). But we give considerable deference to the Pension Fund's underlying determination. When an ERISA plan gives a plan administrator "fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), as this one does, we will reverse the administrator's determination only if it is "arbitrary and capricious," *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003).

Helgemo acknowledges the existence of the Pension Fund's discretionary-authority provision. But he says that it violates Michigan law, pointing to a state regulation that says that "an insurer shall not issue" to Michigan employees "a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause." Mich. Admin. Code R. 500.2202(b). An "insurer" includes those "engaged or attempting to engage in the business of making insurance or surety contracts," Mich. Comp. Laws § 500.106(b), and an "insurance contract" means "a contract of insurance, indemnity, suretyship, or annuity issued or proposed or intended for issuance by a person engaged in the business of insurance," *id.* § 500.116(d). By its terms, the regulation applies to "*insurers* with respect to their *insurance practices*." *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 605 (6th Cir. 2009).

But this pension plan governs retirement benefits, not insurance policies. The plan is funded by employers, not by insurance companies. Such self-funded pension plans or retirement benefit plans do not count as insurance contracts under Michigan law, and the Michigan Insurance Code does not refer to them in that way. Further, the Michigan Insurance Code nowhere attempts

to sweep all retirement funds into its gambit. The district court correctly rejected this argument and applied arbitrary-and-capricious review to Helgemo's claim.

*Challenge to the Pension Fund's suspension decision.* Helgemo does not dispute that he satisfies two features of the Pension Fund's work limitations: After retirement, his new jobs involved more than 40 hours a month, and he worked in Michigan. He instead challenges the findings that his new employment fell within the "same industry" or the "same trade or craft." These determinations survive our deferential review if the Pension Fund reasonably interpreted its terms and substantial evidence supported its decision. *See Firestone*, 489 U.S. at 111; *Davis*, 980 F.3d at 547.

1. "Same Industry." Was Helgemo's postretirement work in "the same industry as the type of business activity engaged in by" Hardman or other fund-contributing employers? Yes, a reasonable plan administrator could decide.

While the pension plan does not define this phrase, a Department of Labor regulation, unchallenged by Helgemo, defines "industry" to mean "the business activities of the types engaged in by any employers maintaining the plan." 29 C.F.R. § 2530.203-3(c)(2)(i). In making its decision, the Pension Fund saw Hardman's work and the work of Helgemo's postretirement employment as involving Great Lakes marine work or work in the maritime industry. The record supports this assessment and the idea that the two lines of work intersected. Lake Michigan Carferry and Pere Marquette both performed marine shipping activities in the region. Hardman for its part performed "marine construction" activities in this region. R.5-2 at 2. Marine construction facilitates marine shipping and commercial maritime enterprises. The Pension Fund also was a signatory to the "Great Lakes Floating Agreement," an agreement among several Operating Engineers unions and various employers. R.13-13 at 4. The contract and employer-

6

signatories confirm that the Pension Fund's union members would work on various marine construction projects and facilitate commercial activities in the Great Lakes region and beyond.

Also supporting the Pension Fund's decision is another reality: An inquiry into the work relatedness of two companies is a general one. The more general an inquiry, the more leeway there is for different, but still reasonable, views of the matter.

Pushing back, Helgemo would define industry at a lower level of generality. He suggests that the pension plan prevented him only from working in the "heavy-duty construction industry," while Lake Michigan Carferry and Pere Marquette conducted their business in the "shipping industry." But the language of the Pension Fund's plan does not require such an interpretation. The plan concerned the relevant industries of all fund-contributing employers. More than just the "heavy-duty construction industry" requires operating engineers, as the Floating Agreement demonstrates. Defining the relevant industry of all contributors to this Pension Fund offers more than one reasonable possibility. Because a marine-anchored industry determination does not unreasonably stretch the language's meaning, this challenge fails.

2. "Same Trade or Craft." Was Helgemo's postretirement "employment" "in the same trade or craft in which [he] was employed" at Hardman? Yes, a reasonable plan administrator could determine.

The pension plan does not define "same trade or craft." But a Department of Labor regulation, also unchallenged, defines "trade or craft" to cover "skills[] learned during a significant period of training or practice, which is applicable in occupations in some industry." 29 C.F.R. § 2530.203-3(c)(2)(ii). The definition directs us to look to "the facts and circumstances of each case," including "whether there is a customary and substantial period of practical, on-the-job training or a period of related supplementary instruction." *Id.*

7

This inquiry considers the skills needed for the new and old job responsibilities. In one case, a retiree was originally employed as a meat cutter. *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 650 (8th Cir. 2009). The court concluded that the plan abused its discretion when it suspended the retiree's benefits for his postretirement work as a Pepperidge Farms distributor. *Id.* at 650–51. Because the retiree *never* used the skills he previously acquired in his new job—"cutting meat, grinding meat, wrapping meat, and making meat products"—the plan could not say he worked in the same trade or craft. *Id.* at 650. In another case, the court held that a retiree's work as a "furniture refinisher" fit the "journeyman carpenter" trade of his old job. *Landschoot v. Carpenters Pension Tr. Fund for N. Cal.*, 11 F. App'x 790, 791–92 (9th Cir. 2001). Some material overlap in skills thus is required.

The Pension Fund reasonably concluded that Helgemo's postretirement employment had plenty of overlap in skills with his previous position at Hardman. Helgemo operated similar heavy machinery while working for Hardman and while working after his retirement. The operation of heavy machinery constitutes the type of skill that requires substantial on-the-job training. Summary Report for 47-2073.00 - Operating Engineers and Other Construction Equipment Operators, O*NET OnLine, Dep't of Lab., https://www.onetonline.org/link/summary/47-2073.00 (last visited Mar. 7, 2022). Helgemo used the skills he learned as an operator at Hardman to benefit his new employers.

Although the record does not show the total amount of time Helgemo spent operating heavy machinery, sufficient evidence demonstrated that he did so for nontrivial amounts of time. Helgemo's own sources confirm that he worked on various projects involving heavy machinery for several hours a week. And the record permits the conclusion that he worked more hours on heavy equipment than he let on. The original tip reported that Helgemo operated heavy machinery.

8

Popps then observed him doing so for several hours each day on the two days he investigated his work. When asked about the amount of time he worked on heavy machinery in his new jobs, Helgemo never answered the question with documented support. And he never reported to the Pension Fund in the first place that he had taken a postretirement job despite his "responsibility to send written notification of [his] return to work at any job" and despite the reality that at a minimum there was some overlap between the jobs. R.13-3 at 12. The Pension Fund did not unreasonably conclude that his new employment fit within the same trade as his work at Hardman.

Helgemo takes issue with the Pension Fund's interpretation of the term "trade or craft," suggesting that it means only "what an individual does for a living—his or her occupation." Appellant's Br. at 22. But this definition does not take the ball very far down the field. Helgemo undeniably operated heavy machinery as a part of his new occupation. To the extent his argument turns on job *titles*—his postretirement work as a "general laborer" and "handyman" versus his prior work as an "operator"—the Pension Fund reasonably rejected the argument. The Department of Labor's focus on "the facts and circumstances of each case" confirms that job responsibilities, not job titles, drive the inquiry. 29 C.F.R. § 2530.203-3(c)(2)(ii); *Eisenrich*, 574 F.3d at 650. Otherwise, retirees could sidestep this requirement simply by giving their new job a new title.

Helgemo also disputes the sufficiency of the evidence. He says that the Pension Fund overlooked the documentation he provided about the nature of his reemployment in favor of the limited evidence Popps collected. But this appeal does not turn on our assessment of who had the stronger evidence. It turns on whether substantial evidence showed that Helgemo spent considerable time over the course of his many years of postretirement employment using the same skills that he developed while at Hardman. The Pension Fund's decision was "rational in light of

9

the plan's provisions" and the facts in the record.  *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).

All in all, Helgemo cannot overcome the interpretive leeway we grant the Pension Fund. The plan vests considerable discretion in its administrators to conduct the inquiry based on the facts and circumstances in the record, and that is especially so when it interprets "disputed or doubtful terms."  *Firestone*, 489 U.S. at 111.  The Pension Fund did not abuse this discretion by concluding that the overlap between these jobs sufficed.

We affirm.