112 F.3d 982
 20 Employee Benefits Cas. 2828, 97 Cal. Daily
Op. Serv. 3254,
97 Daily Journal D.A.R. 5634,
Pens. Plan Guide (CCH) P 23,934
Robert L. RICHARDSON; William Alexander; Larry L. Aman;
Kenneth R. Anderson; Jimmie L. Arrington, et al.,
Plaintiffs-Appellants,
v.
The PENSION PLAN OF BETHLEHEM STEEL CORPORATION and
Subsidiary Companies; The Pension Trust of Bethlehem Steel
Corporation and Subsidiary Companies; The General Pension
Board; Michael Dopera, Secretary of the General Pension
Board; Bethlehem Steel Corp., Defendants-Appellees.
 No. 93-36089.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1994.
Decided Oct. 17, 1995.
Opinion Withdrawn and Petition for
Rehearing Granted Aug. 2, 1996.
Reargued and Submitted Oct. 16, 1996.
Decided May 2, 1997.
 
 Steven Bert Frank, Frank & Rosen, Seattle, WA, for plaintiffs-appellants.
 Richard J. Omata, Karr, Tuttle, Campbell, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington, John C. Coughenour, District Judge, Presiding. D.C. No. CV-92-00622-JCC.
 Before: JOHN T. NOONAN, Jr., O'SCANNLAIN, and LEAVY, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must delve into complex issues of statutory and contractual interpretation as we determine a company's liability for shutdown pension benefits following sale and eventual closure of a steel plant.
 
 
 2
 * The appellants are former employees of Bethlehem Steel Corporation ("BSC"), who seek various pension benefits from their former employer. While they were employed at BSC, BSC and the United Steel Workers of America entered into a Pension Agreement ("Agreement"), a collectively bargained agreement governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. A different document, the Pension Plan of BSC ("Plan"), implements the terms of the Agreement. The Plan is administered by the General Pension Board.
 
 
 3
 At issue here are so-called Rule-of-65 and 70/80 benefits provided under sections 2.6 and 2.7 of the Plan, respectively. These benefits are provided to employees who satisfy certain age and service requirements and whose "continuous service is broken by reason of a permanent shutdown of a plant."[1] For this reason, the benefits are termed "shutdown benefits."
 
 
 4
 The controversy surrounding the shutdown benefits began in 1982 when the BSC Board of Directors decided to divest the company of its West Coast properties. Because it was concerned about its potential liability for shutdown benefits, BSC added a new provision, section 5.3(c), to the Plan; that section authorized the General Pension Board to adopt rules and regulations which would provide that a particular sale would not be a break in service. BSC then began negotiating the sale of its Seattle division to Seattle Steel Inc. ("SSI"). BSC notified the United Steelworkers of America ("Union") that it believed that a sale to SSI would not constitute a shutdown if BSC sold the facility as a going concern. The Union disagreed, however, and filed a grievance, contending that the proposed sale constituted a shutdown under the labor and pension agreements, and that its eligible members were entitled to, among other things, Rule-of-65 and 70/80 benefits.
 
 
 5
 BSC could not consummate the sale until this issue was resolved; accordingly, BSC and the Union officials agreed to negotiate. As a result of these negotiations, the parties settled the Union's grievance through a Memorandum of Settlement ("MOS"), and on December 27, 1984, the MOS was ratified by a majority of Union members. The MOS states that the sale to SSI would not be considered a break in continuous service. In exchange for that concession, BSC promised to make cash payments to BSC employees. The amount of the payment depended on the employee's length of service. With regard to the employees' entitlement to future shutdown benefits, the MOS provides that "Bethlehem will provide a 48-month safety net if purchaser's business fails and Bethlehem does not cure the failure...."
 
 
 6
 After the MOS was ratified, the General Pension Board adopted the "Rules and Regulations Governing Continuous Service Under the Bethlehem Steel 1983 Hourly Pension Plan in Connection with the Sale of the Seattle Divisions of Bethlehem Steel Corporation" ("Rules and Regulations"). Like the MOS, these Rules and Regulations determined that the sale to SSI would not constitute a break in service for employees who were hired by SSI. BSC then sold its Seattle plant to SSI effective January 1, 1985.
 
 
 7
 In October 1990, more than five years after BSC sold the plant to SSI, SSI announced that it was going out of business. SSI sold its assets to Salmon Bay Steel Corporation and ceased operations in May 1991. Salmon Bay did not hire any of the former Seattle division employees, and the parties agree that SSI's sale to Salmon Bay was a shutdown.
 
 
 8
 After SSI closed, the former employees applied to the General Pension Board for shutdown benefits. The General Pension Board Administrator denied their claims on the ground that the MOS eliminated shutdown benefits after the forty-eight month safety net. The former employees brought this suit against the Pension Plan of BSC and various other defendants (collectively "BSC") to the district court which agreed with the General Pension Board Administrator and granted summary judgment to BSC. This appeal followed.
 
 
 9
 The former employees first contend that the MOS preserved their entitlement to shutdown benefits. In the alternative, they maintain that if the MOS is interpreted as eliminating their right to shutdown benefits after forty-eight months, then the MOS is an illegal amendment in violation of section 204(g) of ERISA, 29 U.S.C. § 1054(g). Finally, they challenge the district court's Rule 12(b)(6) dismissal of their claim that the General Pension Board breached its fiduciary duties under section 404(a) of ERISA, 29 U.S.C. § 1104(a).
 
 II
 
 10
 In contrast to the General Pension Board Administrator ("Administrator") and the district court, the former employees interpret the MOS as preserving their right to shutdown benefits. We review the district court's grant of summary judgment de novo. Jones v. Union Pac. R.R., 968 F.2d 937, 940 (9th Cir.1992). However, the parties disagree as to whether we should review the Administrator's decision denying benefits de novo or for an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989). The district court declined to rule on the question because it found that the former employees' claims failed even under the more stringent de novo standard. We agree.
 
 
 11
 In determining that the MOS eliminated rights to shutdown benefits, the district court relied both on the language of the MOS and extrinsic evidence that showed that when the Union entered into the MOS, it understood it to preclude shutdown benefits unless SSI failed within forty-eight months. The former employees object both to the district court's conclusion and the method it used in reaching that conclusion.
 
 
 12
 ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501 (9th Cir.1985). Rather, Congress intended that courts apply contract principles derived from state law but be guided by the policies expressed in ERISA and other federal labor laws. Id. at 1502.
 
 
 13
 Accordingly, we have held that terms in an ERISA plan should be interpreted " 'in an ordinary and popular sense as would a [person] of average intelligence and experience.' " Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir.1990) (quoting Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir.1985)). More specifically, we agree with the Sixth Circuit, which has stated that
 
 
 14
 [w]hen disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion.
 
 
 15
 Armistead v. Vernitron Corp., 944 F.2d 1287, 1293 (6th Cir.1991) (citations omitted). Each provision in an agreement should be construed consistently with the entire document such that no provision is rendered nugatory. Id. Typically, however, when a plan is ambiguous, a court will examine extrinsic evidence to determine the intent of the parties. See Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232-33, 1236 (3d Cir.1991).
 
 
 16
 Here, the former employees maintain that the district court should not have considered extrinsic evidence of the parties' intent because the MOS is not ambiguous. They contend that, "read literally," the MOS unambiguously supports their claim for benefits. A review of the relevant provisions of the MOS reveals, however, that such argument is without merit.
 
 
 17
 Section IV of the MOS established a forty-eight month safety net during which time BSC would pay shutdown benefits if SSI failed and BSC did not cure the failure. Section V.A of the MOS then provides that "[c]essation of Bethlehem employment with commencement of employment by purchaser will not be deemed a break in pension continuous service." Section V.B goes on to say that
 
 
 18
 Bethlehem will credit employee's continuous service with the purchaser as if it were Bethlehem employment for Bethlehem pension vesting and eligibility purposes. Accordingly, such continuous service will be treated as Bethlehem pension continuous service for eligibility for 65/10, 62/15, 30-year, 60/15 and deferred vested retirement, including meeting the various pension age requirements.
 
 
 19
 Read together, the above-quoted provisions indicate that service with SSI constitutes continuous service for purposes of the named pension plans but that shutdown benefits would be available only if SSI failed during the forty-eight month safety net. The former employees, however, read Section V.A and the first sentence of V.B to mean that their service with SSI will be treated as continuous service for all the pension plans. That reading would be entirely plausible were it not for Section IV and the remaining sentences of V.B. After Section V.A states that new employment with SSI "will not be deemed a break in continuous service," Section V.B goes on to list the various pension plans for which "service [with SSI] will be treated as Bethlehem pension continuous service." Notably, the list does not include Rule-of-65 and 70/80 shutdown benefits. Further, Section IV's safety net provisions provide a forty-eight month period during which BSC would pay shutdown benefits if SSI failed. That provision is inconsistent with the understanding that shutdown benefits would be available indefinitely.
 
 
 20
 The most that one can say in support of the former employees' position is that the MOS is ambiguous because it does not explicitly state that shutdown benefits are eliminated once the safety net has expired. That conclusion does not assist them, however, because a finding of ambiguity would permit us to examine extrinsic evidence to determine the parties' intent in entering into the MOS. The extrinsic evidence at issue here consists primarily of deposition testimony of Union negotiators who state that the Union understood the MOS to preclude shutdown benefits forever unless SSI failed within forty-eight months.[2]
 
 
 21
 Therefore, we agree with the district court that the MOS eliminated shutdown benefits after the forty-eight month safety net expired.
 
 III
 
 22
 BSC's former employees next argue that if the MOS is construed as wholly eliminating shutdown benefits after forty-eight months, then it is an illegal amendment in violation of 29 U.S.C. § 1054(g). The district court rejected this claim, holding that the MOS and the Rules and Regulations were interpretations of the Agreement and the Plan rather than amendments thereto.
 
 29 U.S.C. § 1054(g) provides:
 
 23
 (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan....
 
 
 24
 (2) For the purposes of paragraph (1), a plan amendment which has the effect of -
 
 
 25
 (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or
 
 
 26
 (B) eliminating an optional form of benefit with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfied (either before or after the amendment) the preamendment conditions for the subsidy.
 
 
 27
 In this case, BSC and the Union disagreed over whether the 1984 sale would trigger shutdown benefits. They settled the dispute by executing the MOS: The Union agreed that the sale to SSI would not constitute a break in continuous service triggering immediate shutdown benefits; BSC made cash payments to the employees; and BSC agreed to provide a "safety net" of shutdown benefits if SSI failed within 48 months. The employees now contend that the MOS was an illegal ERISA-violating amendment because it limited shutdown benefits to 48 months after the sale to SSI.
 
 
 28
 The resolution of this issue turns on whether the MOS was an "amendment" or an "interpretation". Section 1054(g) applies to amendments to a Plan, not to an interpretation of the Plan's terms.
 
 
 29
 The employees point to our decision in Fentron Industries v. National Shopmen Pension Fund, 674 F.2d 1300 (9th Cir.1982), to support their claim that the MOS amended the Plan. In that case, we ruled that even when the formal terms of the Plan are not changed, taking action indirectly to reduce vested rights of members has the effect of an amendment and hence will be considered an amendment under 29 U.S.C. § 1053. However, Fentron did not attempt to establish a test for when a Plan is amended; moreover, it addressed § 1053, not § 1054(g). More relevant to this issue is Oster v. Barco of California Employees' Retirement Plan, 869 F.2d 1215 (9th Cir.1988). In Oster, we relied on cases from the Seventh and D.C. Circuits to rule that a modification of a Plan's lump-sum distribution policy was not an amendment. In doing so, we adopted the D.C. Circuit's reasoning that "the word 'amendment' is used as a word of limitation" in § 1054(g); "Congress did not state that any change would trigger the ... provisions; it stated that any change by amendment would do so." Id. at 1221 (quoting Stewart v. National Shopmen Pension Fund, 730 F.2d 1552 (D.C.Cir.), cert. denied, 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984)); accord Dooley v. American Airlines, 797 F.2d 1447 (7th Cir.1986).[3] "[W]e are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which was already firmly ensconced in the pension document." Id. (quoting Dooley, 797 F.2d at 1452).
 
 
 30
 We conclude that the MOS was not an amendment of the Plan. Rather, we are persuaded it was an interpretation resulting from a negotiated settlement over the application of the Plan's provisions to the sale to SSI. The Plan explicitly contemplated that the General Pension Board would issue rules and regulations to resolve whether the sale of a plant to another company would be a break in continuous service.[4] Providing a limited "safety net" to the employees did not amend the Plan; it resolved the dispute over what benefits the employees of the Seattle division would receive. The Plan's Rule-of-65 and 70/80 benefits remained unchanged for the rest of BSC's employees.
 
 
 31
 Equitable considerations also weigh against the former employees. When the Union found out that BSC did not view the sale to SSI as plant shutdown causing a break in continuous service, it filed a grievance. In the MOS, the Union agreed that the sale would not be a shutdown; in exchange, they got cash payments and the 48-month "safety net". They cannot now claim that the safety net they negotiated for themselves violates ERISA and thus must be converted into a perpetual safety net of shutdown benefits.[5]
 
 IV
 
 32
 Finally, the former employees contend that the General Pension Board breached its fiduciary duties under § 404(a) of ERISA, 29 U.S.C. §§ 1104(a)(1)(A), (B) and (C), when it adopted the Rules and Regulations stating that the sale to SSI was not a break in service. The employees claim that the General Pension Board knew or should have known that BSC's sale to SSI was a "sham" because BSC knew that SSI was sure to fail. The district court dismissed appellants' claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that appellants had failed to state a claim.
 
 
 33
 Section 1132 establishes ERISA's civil enforcement mechanism. Under § 1132(a)(1)(B), a participant may bring a civil action "to recover benefits due to him under the terms of his plan." The former employees frame their claim as one for the benefits they were due to receive but for the General Pension Board's action. This claim fails because, as discussed above, the former employees do not have a valid claim for benefits under the terms of the MOS.
 
 V
 
 34
 BSC and the Union negotiated the MOS and agreed on the package of benefits it conferred. The employees had the benefit of the safety net for four years; they agreed in 1984 that they would bear the risk of SSI's failure after that point. Unfortunately, that risk turned out to be a bad one to take. But the former employees cannot shift that risk to someone else after the fact; they cannot extract more benefits today than they bargained for in the MOS in 1984.
 
 
 35
 AFFIRMED. Each party shall bear its own costs.
 
 
 
 [1]
 More fully, these sections provide:
 70/80 RETIREMENT
 
 
 [2]
 6 Any participant who has not attained the age of 62 years and who shall have had at least 15 years of continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more, or (ii) whose combined age and years of continuous service shall equal 80 or more, and
 (a) whose continuous service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof or by reason of a layoff or physical disability
 ....
 shall be eligible to retire on or after February 28, 1983, and shall upon his retirement (hereinafter "70/80 retirement") shall be eligible for a pension;....
 RULE-OF-65 RETIREMENT
 
 
 [2]
 7 Any participant (i) who shall have had at least 20 years of continuous service as of his last day worked, (ii) who has not attained the age of 55 years, and (iii) whose combined age and years of continuous service shall equal 65 or more but less than 80, and
 (a) whose continuous service is broken by reason of a layoff or disability, or
 (b) whose continuous service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status as a result of a permanent shutdown of a plant ...
 ....
 and who has not been offered suitable long-term employment ... shall be eligible to retire on or after February 28, 1983, and shall upon his retirement (hereinafter "rule-of-65 retirement") be eligible for a pension....
 
 
 [2]
 In an alternative attempt to prevent the court from considering the extrinsic evidence, the former employees contend that the parties' unwritten intent is irrelevant because "oral agreements are not competent to modify written employee benefit plans."
 Because 29 U.S.C. § 1102 provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," courts have held that oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan. Schoonmaker v. Employee Sav. Plan, 987 F.2d 410, 412 (7th Cir.1993); Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1296 (5th Cir.1989). However, courts have distinguished between oral statements that contradict or supersede the terms of an ERISA plan and oral interpretations of a plan's provisions that are not contrary to the plan's written provisions. Schoonmaker, 987 F.2d at 412; see also Kane v. Aetna Life Ins., 893 F.2d 1283, 1285-86 (11th Cir.), cert. denied, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (holding that an oral interpretation of an ambiguous plan provision will be given effect). Appeal to the "no oral modification" rule thus is unpersuasive because the extrinsic evidence at issue here did not "modify" the MOS but merely interpreted it.
 
 
 [3]
 In a lengthy footnote to Oster, we explained that the rule of Fentron was still viable but was properly distinguishable. Instead of applying Fentron, we stated "as in Stewart and Dooley, there was no 'plan amendment' in the technical sense. The Committee made no actual change in the provisions of the Plan; it merely adopted a policy which applied to a provision which was already part of the Plan." Oster, 869 F.2d at 1221
 
 
 [4]
 Plan section 5.3(c) provides:
 Service with another employer to which an Employing Company sells or transfers all or part of a plant, department, division, location, facility, subsidiary or other unit of such Employing Company may be credited as continuous service under this Plan in accordance with and for such purposes as may be set forth in rules and regulations adopted by the General Pension Board with respect to each such sale or transfer.
 
 
 [5]
 Although we do not reach the question, we note that § 1054(g) also requires that the Plan participant have "satisfied (either before or after the amendment) the preamendment conditions" for the benefit. It appears that the plaintiffs in this case satisfy the conditions for Rule-of-65 and 70/80 benefits only by virtue of the MOS's provisions; arguably they do not satisfy the preamendment conditions for those benefits