**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES TAPLEY; MICHAEL CHAPMAN,
*Plaintiffs-Appellants*,

v.

LOCALS 302 AND 612 OF THE
INTERNATIONAL UNION OF
OPERATING ENGINEERS-EMPLOYERS
CONSTRUCTION INDUSTRY
RETIREMENT PLAN,
*Defendant-Appellee.*

No. 11-35220

D.C. No.
3:10-cv-00033-
HRH

OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, Senior District Judge, Presiding

Argued and Submitted
November 5, 2012—Seattle, Washington

Filed September 6, 2013

Before: William A. Fletcher and Raymond C. Fisher,
Circuit Judges, and Raymond J. Dearie, District Judge[*]

Opinion by Judge Dearie

---

[*] The Honorable Raymond J. Dearie, Senior United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### ERISA

The panel reversed the district court's judgment upholding ERISA pension plan trustees' decisions that two plan members were precluded from working certain post-retirement jobs if they wanted to collect retirement benefits.

The panel held that the trustees abused their discretion by failing reasonably to interpret ERISA plan language defining post-retirement service that precluded the receipt of retirement benefits.

### COUNSEL

Michael Flanigan, Walther & Flanigan, Anchorage, Alaska, for Plaintiffs-Appellants.

Catherine A. Rothwell (argued) and Frank J. Morales, McKenzie Rothwell Barlow & Korpi, P.S., Seattle, Washington, for Defendant-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

DEARIE, Senior District Judge:

James Tapley and Michael Chapman appeal a judgment of the district court upholding the interpretation of plan language by the Trustees of their pension plan. The Trustees determined that appellants' respective post-retirement jobs as a traffic flagger and snow plow operator fell into the same "job classification" as their former union jobs as skilled mechanics. On that basis, each appellant was precluded from working his job if he wanted to collect retirement benefits. Tapley and Chapman brought suit against the Trustees under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that the Trustees' interpretation of plan language was an abuse of discretion. The district court affirmed the Trustees' decisions. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I. BACKGROUND

The relevant facts are largely undisputed. Appellants James Tapley ("Tapley") and Michael Chapman ("Chapman") spent the bulk of their careers working as skilled mechanics and members of the International Union of Operating Engineers ("the Union") in Alaska. Tapley worked as a heavy duty mechanic, station mechanic, fabricator, and welder from approximately 1979 to 2001. Chapman worked as a service oiler, mechanic, fabricator, and welder from approximately 1984 to 2001. Their respective employers made contributions to Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Plan ("the Plan"), a multi-employer,

collectively bargained pension plan as defined by ERISA, 29 U.S.C. § 1002(37)(A).

The Plan permits participants to take early retirement if they have "attained age 52 and completed ten or more years of Credited Service." The Plan also permits early and normal-age retirees to work while receiving retirement income as long as they "completely refrain from Post-Retirement Service of 51 or more hours during any calendar month."[1] Section 6.06 of the Plan defines "Post-Retirement Service" as all employment that is:

> (a) within the *geographic area* covered by the Plan which for purposes of this Section shall consist of all of the State of Alaska and the State of Washington;
>
> (b) in a *job classification* in which the Participant was employed while in Covered Employment, whether or not such employment is under the terms of a Collective Bargaining Agreement or written Contribution Agreement or in a supervisory capacity over such job classification; *and*
>
> (c) in the *industry* in which the Individual Employers participate (any business activity

---

[1] The Plan also stipulates that a participant seeking to retire early must refrain from any work with an employer contributing to the fund. Beyond that, the Plan makes distinctions solely with respect to the age at which employees are eligible for early and normal retirement and how income is calculated in each case.

of the type engaged in by the Individual Employers maintaining the Plan).

If a retiree works the proscribed number of hours in "Post-Retirement Service," retirement benefits are temporarily suspended.

The Plan does not define the term "job classification" or otherwise clarify what would be suitable post-retirement employment. This obvious ambiguity in Plan language is the focus of this appeal. Tapley and Chapman each found jobs with the State of Alaska Department of Transportation ("DOT") that they believed would allow them to continue working without sacrificing retirement income. But in both cases, the Trustees found that appellants' DOT jobs were in the same "job classification" as their union positions (hereinafter "Covered Employment") and were therefore "Post-Retirement Service."

## A. James Tapley

Tapley applied to retire early, at age 52, after more than 20 years in Covered Employment as a heavy duty mechanic. At the time of his application for retirement in July 2007, he was working for the State of Alaska as a "light duty" mechanic—a transition to cars and trucks from his Covered Employment focus on heavy duty machinery. After an administrative hearing, the Trustees denied his request for early retirement benefits. As a result, Tapley abandoned mechanic work entirely and commenced early retirement on August 1, 2008.

A few months later, Tapley was offered a three-week temporary job with the State of Alaska as a "traffic

flagger"— work he described as "holding a sign" and "directing traffic." He sought a determination from the Trustees as to whether the flagger position was considered "Post-Retirement Service" under the Plan, but passed up the job when his request went unanswered for several weeks.

When another flagger opportunity arose in April 2009, Tapley accepted the position and began working for fewer than 51 hours per month while he awaited the Trustees' approval. In late April 2009, the Trust Administration Office informed him that the flagger job was also considered Post-Retirement Service because it is "in the Industry." Once again, Tapley discontinued work and appealed the Trustees' decision.

The Trustees held a hearing on August 18, 2009. Tapley was represented in person, by counsel, and testified telephonically. Following the appeal, the Trustees issued a written decision explaining their finding that Tapley's DOT job is in the same "job classification" as his Covered Employment.

## B.  Michael Chapman

Chapman took a different approach to early retirement. Rather than pre-emptively requesting the Trustees' approval, he transitioned to his DOT job as a "snow plow operator" and worked for more than six years in that capacity before applying for early retirement benefits in December 2007, at age 52. The job description Chapman provided listed duties such as snow and ice removal; responsibility for highway safety equipment (e.g., signs, guardrails), drainage, and traffic control; clearing debris and brush; and patching potholes.

On February 13, 2008, the Trust Administration Office informed Chapman that the snow plow operator job was Post-Retirement Service. Chapman conceded that the jobs were in the same "geography" and "industry," but appealed the Trustees' determination that the jobs were in the same "job classification." The Trustees held a hearing on March 17, 2009, and issued a written decision on April 8, 2009, reaffirming their original determination.

## C. The Trustees' Interpretation

Although Tapley's and Chapman's appeals were based on different underlying facts and decided separately, the Trustees employed essentially the same investigative and interpretive processes to reach the same outcome. Because the Plan did not define the term "job classification," the Trustees acknowledged their "independent obligation to determine [its] meaning and application." In both cases, the Trustees declined to "adopt a particular definition." Instead, they offered two explanations for why Tapley's and Chapman's DOT jobs fell within the same "job classification" as their past Covered Employment.

The Trustees' first interpretation looked to the Master Labor Agreement, the Union employment contract. Although flagger and snow plow operator were not listed anywhere in the Agreement, the Trustees grouped appellants' DOT jobs and Covered Employment into the single generic class of "operating engineers," a term borrowed from one of the five "Wage and Classification" groups in the Agreement. The district court readily rejected the approach as unreasonable, and the issue has been abandoned on appeal.

This appeal focuses on the Trustees' second interpretation, which the district court upheld as reasonable. There, the Trustees employed a "duties and skills" test comparing appellants' Covered Employment and post-retirement jobs. They reviewed submitted job descriptions and dispatch cards documenting daily assignments. They also took appellants' testimony. From this information, the Trustees identified similarities between the jobs in terms of duties, skills, and general competencies.

In Tapley's case, the Trustees looked to the State-provided "Request for Referral" form, which classifies his DOT position not as a "flagger," but as an "Equipment Operator" "wage grade 58." The enclosed job description included many duties beyond "flagging traffic":

> Grounds maintenance, brush cutting, flagging, raking, shoveling and general labor[.] Simple or routine maintenance with hand and power tools, drives 1 ton pick-up trucks[.] Sets up signs for traffic control and prepares the equipment for the crew.

The Trustees also requested clarification on the duty "prepares the equipment for the crew," which they learned refers to pre-trip inspections involving checking oil, tires, and lights, and loading tar blocks, cones, signs, and stands.

Ultimately, the Trustees concluded that the duties and skills Tapley required as a flagger were similar or analogous to those required in his Covered Employment as a skilled mechanic. They observed that as a skilled mechanic, Tapley had duties and skills related to *equipment operation*—the broader career area to which the DOT assigned the flagger

job. Specifically, they noted that as a mechanic and welder, Tapley sometimes operated equipment in order to move it into position for servicing, and drove a service truck to carry tools, parts, and lubricants. They also emphasized that Tapley was *qualified* to operate certain equipment, though he did so only once, on a failed dispatch to operate a backhoe. Likewise, when reviewing Tapley's flagger job, the Trustees looked for any duties and skills comparable to the repair and maintenance of heavy duty machinery that Tapley performed as a mechanic. They listed "examples of duties" for all "Sub-Journey" level employees at Tapley's wage grade, such as "checking oil, tires and lights," "operating a pick-up truck and other vehicles and basic equipment such as a sander or grader," and performing "ground maintenance." On that basis, and without elaboration, the Trustees concluded that the two jobs were in the same "job classification."

The Trustees employed the same analysis in Chapman's case, though with some fidelity to the duties and skills actually performed and used. But as in Tapley's appeal, the Trustees concluded that Chapman was working within the same "job classification" for the DOT based on similar, though incidental, duties and skills. For example, they found Chapman's duties as a mechanic—performing preventative maintenance on heavy machinery— to be "similar" to the routine maintenance necessary to operate a snow plow, such as "checking tires, fluid and oil levels, and brakes" prior to operation. They also pointed to the DOT listed "competencies," which require general knowledge of equipment functions. The Trustees compared Chapman's duties as a snow plow operator to the operation of machinery required of him as a skilled mechanic, when he would occasionally move equipment for servicing. They also noted that Chapman "drove a truck" in both positions.

### D.  Procedural History

Tapley and Chapman jointly filed this action in the United States District Court of Alaska pursuant to 29 U.S.C. § 1132(a)(1)(B), (a)(3) seeking to overturn the Trustees' decisions.  Following a trial on the record, the district court upheld the Trustees' use of a "duties and skills" test as reasonable.  The district court also affirmed the Trustees' decisions with respect to Tapley and Chapman, observing that "[t]he Trustees found numerous skills and duties that were the same for each job," which is a "reasonable basis for the Trustees' conclusion" that the positions were in the same "job classification."

The district court also denied appellants' motion to compel the production of documents related to the "Post-Retirement Service" of another union mechanic.  Tapley and Chapman allege that the other mechanic collected early retirement benefits while working more than 51 hours per month as a commercial fuel truck driver.

## II.  DISCUSSION

### A.

Where an ERISA Plan grants "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), "a plan administrator's interpretation of a plan" is reviewed for abuse of discretion, *Canseco v. Constr. Laborers Pension Trust for S. Cal.*, 93 F.3d 600, 605 (9th Cir. 1996).  We review the district court's application of this standard *de novo*.  *Saffle v. Sierra Pac. Power Co. Bargaining*

*Unit Long Term Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996).

We equate the abuse of discretion standard with "arbitrary and capricious" review. *Canseco*, 93 F.3d at 605. Under this standard, the Trustees' interpretation of Plan language is entitled to a high level of deference and will not be disturbed unless it is "not grounded on *any* reasonable basis." *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1218 (9th Cir. 1988) (internal quotation marks omitted). Deference is particularly weighty where, as here, the Plan "confers broad power on the administrators to determine eligibility for benefits under the plan," and the interpreted language is ambiguous. *Smith v. CMTA-IAM Pension Trust*, 654 F.2d 650, 655 (9th Cir. 1981). "[T]he [T]rustees' interpretation need not be the one this court would have reached, but only an interpretation which has rational justifications." *Id.*

The Court's review of the Trustees' interpretation is not without bite, however: "a deferential standard of review does not mean that the plan administrator will prevail on the merits." *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010). When reviewing interpretive challenges for abuse of discretion, the Court closely reads contested terms and "appl[ies] contract principles derived from state law[,] . . . guided by the policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). The Trustees abuse their discretion where they "construe provisions of [a] plan in a way that clearly conflicts with the plain language" of the Plan, *Johnson v. Trustees of W. Conf. of Teamsters Pension Trust Fund*, 879 F.2d 651, 654 (9th Cir. 1989), "render[s] nugatory" other provisions of the Plan, *Richardson*, 112 F.3d at 985, or "lacks any rational nexus to the primary purpose"

of the Plan, *Burditt v. W. Growers Pension Plan*, 636 F. Supp. 1491, 1498 (C.D. Cal. 1986), *aff'd*, 818 F.2d 698 (9th Cir. 1987) (per curiam).

We begin our inquiry with the plain language of the Plan, interpreting it "in an ordinary and popular sense as would a person of average intelligence and experience." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (alteration and internal quotation marks omitted). The term "job classification" is clearly ambiguous; it is neither defined nor mentioned elsewhere in the Plan, and, not surprisingly, we have not seen the same language in any other plan that has received judicial scrutiny.[2]

Although we agree with the district court that it is reasonable to interpret the term "job classification" to mean more than "job title," this observation does not resolve the

---

[2] The term "job classification" is neither used nor defined in ERISA. While it is employed sporadically in ERISA's regulations, more often than not the term is qualified—unhelpfully for our purposes—by the additional terms, "reasonably defined." *See, e.g.*, 29 C.F.R. § 2530.200b-3(e)(6) ("Crediting of service under this paragraph must be done consistently with respect to all employees within the *same job classifications, reasonably defined*." (emphasis added)); *id.* § 2530.200b-3(f)(3)(i) (in assessing equivalencies based on earnings for employees "without a regular work schedule," plan may look to "average hours worked by the employee . . . provided that the basis so used is consistently applied to all employees within the *same job classifications, reasonably defined*" (emphasis added)); *cf. Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744 (2004) ("[ERISA] does not explicitly define 'early retirement benefit.'"). The regulation's definition of "trade or craft" does include the following language: "[T]he determination whether a particular *job classification*, job description or industrial occupation constitutes or is included in a trade or craft shall be based upon the facts and circumstances of each case." 29 C.F.R. § 2530.203-3(c)(2)(ii) (emphasis added).

dispute. The plain language of the Plan imposes another clear constraint: "job classification" under Section 6.06(b) must be less encompassing than "industry" under Section 6.06(c), which refers to the broader types of business activities engaged in by the employers maintaining the Plan. An interpretation that conflates the two terms conflicts with the plain language of the Plan by rendering the term "job classification" nugatory. *See Richardson*, 112 F.3d at 985 ("Each provision in an agreement should be construed consistently with the entire document such that no provision is rendered nugatory."); *Brown v. S. Cal. IBEW-NECA Trust Funds*, 588 F.3d 1000, 1003 (9th Cir. 2009) (holding that a plan administrator abuses its discretion if its "interpretation of the Plan creates a much broader category of prohibited activities than is supported by the plain language of the Plan").

The Trustees' expansive interpretation of the term "job classification" does just that. By construing the language to preclude appellants from retiring to unskilled jobs entailing roadside work, the Trustees effectively re-write the plan to "sweep within its ambit an overly broad range of 'skills.'" *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 544 F. Supp. 2d 848, 857 (D. Minn. 2008), *aff'd in relevant part*, 574 F.3d 644 (8th Cir. 2009). Not only does this interpretation give the Trustees the power to preclude post-retirement employment within the construction industry, but the record suggests that they *intended* to do so. On July 17, 2008, a pension representative wrote to Tapley, "Benefit payments will resume whenever you either stop working entirely for the State of Alaska or begin working in a new position that is not in the Industry." Then again, on April 20, 2009, the Trustees informed Tapley, "it has been determined that your proposed work as a flagger

/ equipment operator for the State of Alaska would be considered in the Industry. For this reason, your request to perform any of this work while collecting retirement benefits is denied." This construction of Plan terms conflicts with the plain language, renders the term "job classification" meaningless, and contravenes the purpose of the Plan.

Tapley's case illustrates the problem. His Covered Employment as a skilled mechanic was a far cry from his DOT position as a "flagger" or road crew worker—both based on the type of duties performed and the level of skill required. Yet the Trustees ignored these fundamental differences and chose instead to emphasize any "similar" and "analogous" duties, skills, and general competencies—many of which were listed in broad job abstracts—without properly considering how incidental they were, how seldom the duties were performed, or whether the skills Tapley developed during the many years of Covered Employment were ever used or required at all.

In fact, Tapley did not engage in "flagging" or other roadside work in Covered Employment as a skilled mechanic. It was only in anticipation of early retirement that he completed additional training through the State of Alaska to obtain a "flagger card." Upon close review of the record, it appears that the only overlap between the positions in terms of ongoing duties is driving a service truck and the associated routine maintenance, such as checking oil, tires, and lights. This modest overlap is far from meaningful considering how different the positions are in actual practice. According to Tapley's testimony, his main duty, flagging, consisted of "holding [a] sign" and "directing traffic." Even when we consider the other duties listed in the broader job description, the essential nature of the job remains roadside work,

involving "the more routine, non-specialized and repetitive tasks that do not require the more specialized skills."  To preclude Tapley from doing such basic work on the basis of insignificant and incidental similarities between jobs would effectively preclude him from working in the industry, contrary to the Plan's express provisions.

The Trustees used the same flawed approach in Chapman's case, extracting what they perceived as similar duties and skills.  Essentially, Chapman sought to transition from a skilled mechanic and service oiler to a snow plow operator, involving snow and ice removal, roadside work, and operation of some heavy-duty equipment.  While the DOT classified the job as an "operator / laborer," it is undisputed that this position did not require Chapman to *repair* machinery—his primary role as a Union mechanic—or utilize any of the special skills he acquired during his 17 years of Covered Employment.  Rather than acknowledging this significant difference in core skills used for each job, the Trustees chose instead to note that, in his Covered Employment, Chapman sometimes operated equipment when he had to move it for servicing.  The Trustees also gave great weight to the existence of a few overlapping duties, without considering the mundane and incidental nature of the tasks compared to the different core skills Chapman used for each position.  For example, as in Tapley's case, the Trustees stressed that Chapman "drove a truck" in both positions.  They also concluded that his "preventative maintenance" duties as a snow plower—including "checking tires, fluid and oil levels, and brakes"—meant that he "performed . . . duties and used *similar* skills as a mechanic and service oiler." Again, we do not find this overlap between jobs to be meaningful.  Indeed, it is difficult to imagine any post-Union

jobs in the construction industry that do not require at least some "similar" or "incidental" duties and skills.

*Eisenrich* is instructive and persuasive. *See Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 544 F. Supp. 2d 848 (D. Minn. 2008), *aff'd in relevant part*, 574 F.3d 644 (8th Cir. 2009). Eisenrich was a meat cutter seeking to retire as a sales development associate ("SDA") for a baked-goods company. *Id.* at 852–53. His plan permitted post-retirement work in the same industry as long as the new job was not in the same "trade or craft" and "geographic area." *Id.* at 851. The trustees equated the two positions based on the shared "generally applicable skill" of "merchandising," including product rotation, inventory, and ordering. *Id.* at 852, 855–56. The district court found this interpretation to be unreasonable because it would preclude Eisenrich from taking almost any job in food retail—an industry where merchandising plays an integral role. *Id.* at 856–57.

Instead, the court endorsed a more holistic approach:

> Eisenrich previously worked as a meat cutter; he now delivers Pepperidge Farm crackers, cookies, and baked goods to grocery stores. Common sense dictates that this job is not in the same "trade or craft" as Eisenrich's prior work as a meat cutter because *he does not primarily utilize skills learned over a substantial period of time as a meat cutter*, notwithstanding that work as an SDA might

involve some "merchandising" of Pepperidge Farm products.

*Id.* at 858 (emphasis added).

Common sense strongly suggests that a position flagging traffic or plowing snow is not in the same "job classification" as a skilled mechanic repairing heavy equipment utilizing specialized skills acquired over a long career. These two positions have little in common beyond basic skills widely acquired through everyday experiences. The Trustees used the same flawed approach as the trustees in *Eisenrich*, emphasizing areas of overlap without regard to the core skills and duties actually required and performed. Similarly, the Trustees focused on abstract job descriptions that strayed far from the reality of appellants' jobs. For example, the record does not support the claim that Tapley's DOT job as a "flagger" was anything more than what he described: a position flagging traffic and doing basic roadside work. But by categorizing the job as an "Equipment Operator" "wage grade 58" and emphasizing broad competencies, the Trustees made superficial connections between otherwise disparate jobs.

Appellees deny that the Trustees' interpretation is so expansive. They argue that the Trustees "diligently and comprehensively compared the skills and duties used by Tapley and Chapman in Covered Employment to those required for an Equipment Operator with the State of Alaska, and there was *material and significant overlap*." The record simply fails to support such a contention. The record before us fails to identify a single instance when the Trustees found any overlapping skills or duties that were "material" or "significant," much less essential to the work performed.

Pension plan participants should be able to reasonably rely on plan terms in planning their retirement. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) ("There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them."). Yet the Trustees' vague standard for interpreting the term "job classification" left Tapley and Chapman in the dark about what was acceptable.

ERISA does not require the provision of benefits to early retirees, but this Plan does. The availability of earned retirement benefits cannot be frustrated by an untethered interpretation of the Plan that takes away what the Plan was designed to provide. Simply stated, what the Plan provides, the Trustees may not take away. It is not for this Court to proffer a reasonable interpretation of Plan language, but instead to identify and reject any interpretation that is arbitrary, misfocused and contrary to the intent of those responsible for its terms. We must do so here. We are unable to see how any sensible application of the skills and duties test to the established facts can support the Trustees' conclusion.

For the foregoing reasons, we reverse the district court and return the matter to the Trustees for reevaluation of the merits in a manner consistent with the court's opinion.

## B.

Our conclusion that the Trustees abused their discretion makes it unnecessary to reach appellants' contention that the district court abused its discretion by denying their motion to compel the production of documents related to the "Post-

Retirement Employment" of Alvin Shampine, another retired Local 302 mechanic. Appellants allege that the Trustees permitted Shampine to transition from mechanic to commercial fuel truck driver while still drawing his union pension, implying that his post-retirement work was not found to be in the same "job classification." Tapley and Chapman seek to compel this information as evidence of inconsistent decisions by the Plan administrator. Our holding that the Trustees abused their discretion obviates the need for this discovery. We therefore decline to reach this issue.

That being said, we remand this matter to the Trustees on an open record, giving appellants the opportunity to obtain the information they seek and to include it in the administrative record on remand.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **REVERSED**.