**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN J. O'ROURKE, *Plaintiff-Appellant*, | No. 17-17419 |
| v. | D.C. No. 3:16-cv-02007-WHO |
| NORTHERN CALIFORNIA ELECTRICAL WORKERS PENSION PLAN; BOARD OF TRUSTEES OF THE NORTHERN CALIFORNIA ELECTRICAL WORKERS PENSION TRUST, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted March 15, 2019
San Francisco, California

Filed August 16, 2019

Before: J. Clifford Wallace, Eugene E. Siler,[*]
and M. Margaret McKeown, Circuit Judges.

Opinion by Judge Wallace

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

**SUMMARY**[**]

**ERISA**

The panel affirmed the district court's grant of summary judgment in an ERISA action challenging the denial of plaintiff's request for early retirement benefits.

Plaintiff accrued benefits through a multiemployer ERISA plan during his work as an electrician. When he left this position to work for an electrical workers' union as an administrator, he sought early retirement benefits from the plan. The plan's board of trustees decided that plaintiff's union work fell within the plan's definition of "prohibited employment," and so no benefits were due for any month in which he engaged in that work.

Reviewing the denial of benefits for an abuse of discretion, the panel held that any procedural irregularities in the actions of the board were minor and, at most, weighed only slightly and weakly in favor of holding that an abuse of discretion occurred. The panel held that the board did not abuse its discretion in interpreting the plan's definition of prohibited employment to include plaintiff's union work because the board's interpretation did not clearly conflict with the plan's plain language, did not render any other plan provision nugatory, and did not lack a rational nexus to the plan's purpose.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Teresa S. Renaker (argued) and Margo Hasselman Greenough, Renaker Hasselman Scott LLP, San Francisco, California, for Plaintiff-Appellant.

Clarissa A. Kang (argued), R. Bradford Huss, and Angel L. Garrett, Trucker Huss, APC, San Francisco, California, for Defendants-Appellees.

---

**OPINION**

WALLACE, Circuit Judge:

John O'Rourke is an electrician who accrued benefits through a multiemployer ERISA pension plan and was a member of the plan's board of trustees (Board). After O'Rourke left this position to work for an electrical workers' union as an administrator, he sought early retirement benefits from the plan. The Board denied his request. O'Rourke then filed this action for judicial review of the denial, and the district court entered summary judgment in the Board's favor. We have jurisdiction over O'Rourke's appeal from that judgment under 28 U.S.C. § 1291, and we affirm.

I.

A.

The Northern California Electrical Workers Pension Plan (Plan) is a multiemployer plan governed by the Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. § 1002(37)(A). The Plan is funded through the Northern California Electrical Workers Pension Trust

(Trust), to which participating employers contribute, and is administered by the six-member Board, containing three labor representatives and three management representatives. The Plan provides its participants with three types of benefit — (1) normal pension, (2) early pension, and (3) disability pension — payable as a monthly annuity when participants attain certain Plan-defined eligibility requirements. The Plan provides that the Board shall resolve "[a]ny dispute as to eligibility, type, amount or duration of benefits," Plan Art. IX, § A, and grants the Board "the exclusive power and discretion to interpret the provisions of the Plan and any rules issued under the Plan, and to determine all questions arising under the Plan including eligibility for benefits," Plan Art. XIII, § A.

Relevant to this appeal, the Plan provides that participants become eligible for early retirement and an early pension at age fifty-five, if they have also accumulated ten or more years of covered employment. Plan Art. III, § (B)(1). However, no benefit payments are made for either normal pensions or early pensions "for any month in which the Participant works in Prohibited Employment." Plan Art. III, § G(1). For participants who have not yet reached the age of sixty-five, the Plan defines "Prohibited Employment" as "the performance of services in any capacity in the Electrical Industry." Plan Art. III, § G(3)(a). In turn, "Electrical Industry" is defined as "all branches of the Electrical Trade in the United States." Plan. Art. I. "Electrical Trade" is not defined.

## B.

John O'Rourke is a participant in the Plan who began working as an electrician in 1979. In 1999, he was elected business manager of his local union, the International Brotherhood of Electrical Workers (IBEW) Local 6. As

business manager, O'Rourke served as a Plan trustee on the Board.

In September 2010, O'Rourke proposed that the Board adopt a change in the Plan's suspension of benefits rules to exempt work for unions from the definition of prohibited employment. O'Rourke recommended that the Plan Counsel review the Plan and Trust and determine "what changes, if any, are required to accomplish this." The Board concurred with that recommendation, but no further action was taken at that time. O'Rourke then left his Local 6 and Board position to join IBEW as an International Field Representative, followed by service as Vice President for the IBEW Ninth District. O'Rourke applied for an early retirement pension from the Plan in June 2014, in anticipation of his upcoming fifty-fifth birthday. It is undisputed that once O'Rourke turned fifty-five, he met all other eligibility requirements for the early pension, aside from the suspension of benefits provision. It is also undisputed that O'Rourke's work for IBEW did not include traditional work as an electrician, such as wiring, repair, installation, and maintenance.

Meanwhile, Plan Counsel investigated the matter as requested. In March 2014, Plan Counsel submitted a memorandum to the Board opining that no changes to the Plan were necessary because the Plan's prohibited employment did not include work for a union. The Board considered the opinion at a meeting the following week, where two trustees expressed "strong disagreement with the legal opinion," indicating that "employment for Local 6, or any other IBEW for that matter, [should be] considered 'covered employment' . . . subject to suspension of benefits." The Board did not resolve the matter at that

meeting; instead it requested that Plan Counsel conduct further research on the matter.

Plan Counsel submitted a second memorandum in August 2014. After reviewing past Board meeting minutes, Plan Counsel concluded that the Board had previously defined prohibited employment "broadly to include work that may not specifically bear upon or utilize skills and experience obtained by work in the electrical trade." Plan Counsel therefore opined that the Board should not adopt any policy of categorical exemption, and instead make each determination based on "all the facts and circumstances that may be submitted regarding the nature of the work in question."

The Board discussed the second memorandum and O'Rourke's application at its next meeting, resolved to defer decision pending further information from O'Rourke, and requested an explanation from him "as to why he believes the work he is performing for [IBEW] is not prohibited under the Plan." O'Rourke responded by letter, explaining that his duties were "purely administrative" and did "not require, directly or indirectly, the use of the same skills employed by electricians in an electrical trade or craft."

The Trustees discussed O'Rourke's response via email in anticipation of their next meeting in December, with one trustee stating that O'Rourke's application was "a loser barring an amendment to the plan." At the next meeting, the Board again discussed O'Rourke's application and was again unable to reach consensus. Plan Counsel then opined that the suspension of benefits provision was ambiguous and suggested clarifying its meaning so that the Board could reach consensus, to which the Board agreed.

The following month, in January 2015, O'Rourke's counsel sent a demand letter to the Board stating O'Rourke's position that any interpretation of the Plan to include his IBEW employment would be an abuse of discretion. Trustees discussed the letter via email, with one trustee stating that O'Rourke's description of his work as "administrative" was not outcome determinative, with a personal reference to O'Rourke's time as a trustee:

> First, to use the term "administrative", as if it's [sic] use in and of itself it [sic] would render his benefits payable, fails to address how the Trustees have interpreted the Plan in the past. Time and time again, Plan participants sought to have their benefits paid while working in and [sic] administrative capacity. Mr. O'Rourke should know that better than anyone since it was he that championed that determination.

Plan Counsel also stated that "management has not relented on the issue."

The Board met again in March 2015, and this time agreed to deny O'Rourke's application. In a letter to O'Rourke's attorney, the Board explained that O'Rourke's IBEW employment fell within prohibited employment because it entailed "the performance of services of some capacity in the Electrical Industry," and no exception applied. O'Rourke appealed that decision. The Board met again in August and denied the appeal. The Board explained that it agreed there was no factual dispute over O'Rourke's IBEW duties or that the Plan defined "Electrical Industry" as "Electrical Trade," but that under its interpretation of

"trade," O'Rourke's work came within the prohibited employment definition.

O'Rourke filed this action against the Plan and the Board in April 2016. O'Rourke alleged that he was entitled to an early pension and claimed benefits pursuant to ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). The parties cross-moved for summary judgment and the district court granted the Board's motion and denied O'Rourke's motion. The district court reasoned that the Board did not abuse its discretion by interpreting the Plan to include O'Rourke's IBEW position as prohibited employment because both parties' interpretations were reasonable. O'Rourke timely appealed.

## II.

"Where an ERISA Plan grants discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a plan administrator's interpretation of a plan is reviewed for abuse of discretion." *Lehman v. Nelson*, 862 F.3d 1203, 1216 (9th Cir. 2017) (quoting *Tapley v. Locals 302 & 612 of Int'l Union of Operating Eng'rs-Emp'rs Const. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013)). "We review the district court's application of this standard and the district court's . . . summary judgment de novo." *Id.*

## III.

O'Rourke argues that the Board incorrectly interpreted the Plan to deny his application for benefits. The Plan contains an express discretion provision, Plan Art. XIII, § A, and therefore our review is for abuse of discretion. *Lehman*, 862 F.3d at 1216. Before we address the merits of this argument, however, we must decide how alleged procedural irregularities affect our analysis.

A.

O'Rourke contends that the Board acted "as an adversary bent on denying his claim," *see Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999) (internal quotation marks omitted), rather than as a neutral arbiter acting in the Plan's best interests. According to him, we should view the Board's decision with suspicion, making it easier for us to conclude the Board abused its discretion.

We previously addressed the issue of procedural irregularity in *Abatie v. Alta Health and Life Insurance*, 458 F.3d 955 (9th Cir. 2006) (en banc). In that case, we explained that ERISA provides "for only two alternatives[: w]hen a plan confers discretion, abuse of discretion review applies; when it does not, de novo review applies." *Id.* at 965. Thus, procedural irregularity does not alter the standard of review except in "situations in which procedural irregularities are so substantial" as to make doing so necessary, such as "[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well." *Id.* at 971. O'Rourke agrees that this case does not present such a situation, and thus abuse of discretion review applies.

The question remains, however, whether any procedural irregularities here affect the abuse of discretion review itself. In *Abatie*, we rejected a "sliding scale" approach to this problem, where the greater the irregularity, the lesser the plaintiff's burden. *Id.* at 967–68. Instead, we explained that a "procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Id.* at 972. Thus, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the

administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal quotation marks and citation omitted). But when "[a] more serious procedural irregularity" has occurred, it "may weigh more heavily." *Id.* at 972–73. We did not provide more guidance on the issue beyond these statements, explaining that abuse of discretion review is inherently "indefinite" and requires case-by-case analysis. *Id.* at 969.

In this case, as the district court concluded, the Plan is ambiguous and both sides present plausible interpretations of the Plan language. If we were to accept O'Rourke's assertions that the Board acted as an adversary against him, we might accordingly hold that an abuse of discretion occurred where we otherwise might not. We must therefore first decide how much weight to place on the alleged procedural irregularities in this case before proceeding.

O'Rourke emphasizes four events as procedurally irregular: (1) emails and meeting minutes showing "political hostility" and personal animus towards him; (2) shifting rationales for the denial; (3) the rejection of Plan Counsel's 2014 opinion; and (4) the Board's position reversal from the 2010 resolution. We address each in turn.

First, the record does not support O'Rourke's assertion that certain trustees harbored personal hostility towards him. The meeting minutes and emails reflect that certain trustees strongly disagreed with O'Rourke's interpretation of the Plan, but nothing in the record rises to the level of animus. For instance, calling an argument a "loser" is usually a reflection on the argument's merits, not its proponent's, as seems to be the case in the December email. Similarly, saying that O'Rourke should have known the Board would interpret the Plan in a way that did not favor him was

irrelevant to the merits of O'Rourke's demand letter, as an applicant's knowledge or intent under the Plan does not affect their eligibility for benefits. Thus, we disagree with O'Rourke's argument that the Board acted based on animus rather than in the Plan's best interests.

Second, the Board did not shift its rationales for denying the claim. O'Rourke argues that the Board initially denied his application because prohibited employment included some employment that did not require an electrician's skills, but later denied his appeal because unions provide support to workers in the electrical trade. There is no discrepancy. In denying the application, the Board explained that it was relying on a broad definition of "industry" which included services for IBEW. In denying the appeal, the Board explained that it was relying on a broad definition of "trade," which again included services for IBEW. The Plan defines "Electrical Industry" as "all branches of the Electrical Trade in the United States." Plan. Art. I.  Thus, the definition of "industry" in the first decision and "trade" in the second decision is consistent with the Plan and the Board's position throughout its decision-making and this litigation.

Third, while disregarding the advice of counsel might weigh in favor of holding that an abuse of discretion occurred in a different case, here the record reflects that all parties agreed the Plan was ambiguous and the disagreement was in good faith. In its first memorandum to the Board, Plan Counsel opined that the Plan's prohibited employment definition related to work involving the skills used by an electrician. However, in the second memorandum, Plan Counsel acknowledged that Plan Counsel had not reviewed previous determinations made by the Board when that opinion was reached, and that the Board had previously interpreted prohibited employment "more broadly to include

work that may not specifically bear upon or utilize skills and experience obtained by work in the electrical trade." Plan Counsel accordingly revised the original opinion in light of the new information and recommended a case-by-case analysis based on the totality of the circumstances "regarding the nature of the work in question." Thus, while O'Rourke is correct that the Board did not follow Plan Counsel's recommendation, a full picture of the record shows that this fact weighs only slightly against the Board, if at all.

Fourth, the Board's change in position from 2010 to 2014 demonstrates only a change in opinion, not a procedural irregularity. O'Rourke does not argue on appeal, nor could he, that the 2010 resolution to ask Plan Counsel to determine what changes were necessary to exempt union service from prohibited employment constituted binding action. The motion was necessarily tentative because it required further action. Instead, the change in position shows that the Board was once in favor of allowing early pension benefits for IBEW workers, and it then changed its mind. Such a change, in conjunction with other evidence showing disregard of the Plan's terms, could be evidence of bad faith. But the only other evidence in the record supporting bad faith is the Board's rejection of Plan Counsel's opinion. As explained above, the Board's rejection of Plan Counsel's opinion does not show bad faith under the circumstances. Thus, the Board's change in position weighs only minimally in favor of holding that an abuse of discretion occurred here.

Finally, we point out that the Board kept O'Rourke informed at all stages of its decision-making and that none of the putative irregularities prevented the administrative record from being fully developed or prevented the Board or a court from knowing all relevant facts. This record does not

reflect that the Board attempted to keep O'Rourke in the dark or use procedural devices to prevent him from receiving benefits.

Thus, O'Rourke's procedural irregularity argument demonstrates at best only that the current Board held a different interpretation of the Plan from O'Rourke and from past Boards, and that it appeared unwilling to change that interpretation on counsel's advice or O'Rourke's arguments. While this could perhaps indicate some stubbornness beyond the platonic ideal of an open-minded plan administrator, it does not reveal serious procedural irregularities that would weigh heavily against the Board. At most, the Board's actions weigh only slightly and weakly in favor of holding that an abuse of discretion occurred here.

## B.

Having concluded that any procedural irregularities were minor, we turn to the Board's interpretation of the Plan itself. The Plan defines "Prohibited Employment" as "the performance of services in any capacity in the Electrical Industry." Plan Art. III, § G(3)(a). O'Rourke argues that by defining "Electrical Industry" to mean "all branches of the Electrical Trade in the United States," the Plan limits prohibited employment to work involving the skills of an electrician. The Board responds that it does not matter whether the work involves an electrician's skills, so long as it involves any type of livelihood related to electrical work, including administrative work. The question in this appeal is thus whether the Board abused its discretion by interpreting "performance of services in any capacity in the Electrical Industry" to include working for IBEW; i.e., in an administrative capacity for an electrical workers' union. To answer that question, we ask whether the Board's interpretation is unreasonable, "closely read[ing] contested

terms and appl[ying] contract principles derived from state law, guided by the policies expressed in ERISA and other federal labor laws." *Tapley*, 728 F.3d at 1140 (internal quotation marks and alterations omitted) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). We will accept the Board's interpretation unless it is "not grounded on *any* reasonable basis." *Id.* at 1139 (emphasis in original) (quoting *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1218 (9th Cir. 1988)). "The [Board's] interpretation need not be the one this court would have reached, but only an interpretation which has rational justifications." *Id.* at 1139–40 (quoting *Smith v. CMTA-IAM Pension Trust*, 654 F.2d 650, 655 (9th Cir. 1981)).

In *Tapley*, we described three ways in which a Plan administrator's interpretation might fail this test. First, it is an abuse of discretion to "construe provisions of a plan in a way that clearly conflicts with the plain language of the Plan." *Id.* at 1140 (alteration omitted) (quoting *Johnson v. Trs. of W. Conf. of Teamsters Pension Tr. Fund*, 879 F.2d 651, 654 (9th Cir. 1989)). Second, it is an abuse of discretion to interpret a provision in a way that "renders nugatory other provisions of the Plan." *Id.* (internal quotation marks and alterations omitted) (quoting *Richardson*, 112 F.3d at 985). Third, it is an abuse of discretion to give an interpretation that "lacks any rational nexus to the primary purpose of the Plan." *Id.* (quotation marks omitted) (quoting *Burditt v. W. Growers Pension Plan*, 636 F. Supp. 1491, 1498 (C.D. Cal. 1986)). These three types of abuse correspond more or less to basic principles of contract interpretation; i.e., (1) to interpret provisions based on their plain meaning, (2) to interpret provisions in context with other provisions, and (3) to interpret provisions to reach a reasonable outcome that accords with the expectations of the agreeing parties.

O'Rourke argues that all three *Tapley* errors are present here and require us to reject the Board's interpretation. We disagree with each of his arguments.

First, the Board's interpretation does not clearly conflict with the Plan's plain language. O'Rourke makes a strong argument for why the best interpretation of "trade" in the Plan is working as an electrician. However, he fails to exclude the Board's interpretation as a reasonable possibility. The operative language in the Plan is very broad: it defines prohibited employment as "the performance of services *in any capacity* in the Electrical Industry." Plan Art. III, § G(3)(a) (emphasis added). Interpreting "industry" to mean "trade," and "trade" to mean "line of work," it is reasonable to conclude that providing administrative support to electricians is the "performance of services in [some] capacity in the Electrical [line of work]." After all, modern electrical work on large projects often cannot be performed alone; it relies on teams working together that include electricians, supervisors, and administrators. O'Rourke's union work for IBEW, while admittedly further afield from direct administrative support to electricians, is still focused on supporting electricians, and therefore reasonably within the electrical line of work.

Second, the Board's interpretation does not render any other Plan provision nugatory. O'Rourke argues that the Board's interpretation of "Electrical Industry" in Plan Article III renders nugatory its definition in Plan Article I. However, this argument assumes that "Electrical Trade" in Article I has the meaning O'Rourke assigns to it. As explained above, while plausible, that is not necessarily the case because the Board's interpretation of "trade" is reasonable. While  "trade" means "industry" under the Board's interpretation, that circularity does not make the

Article I definition superfluous. Definitions sections in contracts necessarily contain some redundancy. That is inherent in the nature of definitions because they explain what other obligations mean, rather than creating additional obligations themselves. Thus, when a term appears in the definition of another term, it is reasonable for the terms to be synonymous. The situation here might be different if the Board's definition of "industry" in Article III rendered nugatory "trade" in another operative section of the plan, but that is not the case here.

Third, the Board's interpretation does not lack a rational nexus to the Plan's purpose. O'Rourke argues that the purpose behind the Plan's suspension of early retirement benefits is to prevent retirees who already have incomes from competing with younger workers in the same line of work, and that he is not doing so. Thus, O'Rourke argues, he is not competing with anyone else participating in the Plan and the Board's interpretation fails to advance the Plan's purpose.  O'Rourke's argument makes sense when considering his identified purpose. However, the Board articulated additional purposes in its denial letters, including that the Plan should "avoid providing an incentive for experienced electricians to leave fieldwork for an administrative position in the industry and the substantial benefit costs that would go with it." The Board thus explained that preserving assets for retirement through a broad interpretation of prohibited employment was consistent with the Plan's purposes, and that explanation was reasonable.

In sum, none of the three situations we identified in *Tapley* are present here. We therefore conclude that the Board's interpretation of the Plan was reasonable. The

district court correctly entered summary judgment in the Board's favor.

**AFFIRMED**.